Good morning, Your Honors. May I please the Court? I'm Dale Fuel. I represent Mr. Erlichman. The issues have been clearly briefed, I believe. There really isn't a lot to be discussed, but the primary issue and the primary thrust of why this appeal has taken place is how far does a union get to represent its client before it breaches that duty of fair representation? It has been clearly etched over time what the role is and what three areas that we look to, to establish whether or not there's been a breach of that duty, and it either has to show discriminatory conduct, arbitrary behavior, or bad faith conduct on the part of the union. But in the instance of this particular case, where we have a union presenting the employee with what the employee believed was a voluntary quit that contained language that was releasing not only the employer... Let me stop you right there. Let me just make sure I've got the sequence properly in mind in terms of what happened. He gets terminated. He gets what? Terminated. He gets canned. He comes to the union, asking the union to grieve on his behalf. The union indicates that it may be at will. It thinks it should. The union then investigates and discovers that there are three notices of misbehavior and I don't know what the proper term is, that were noticed to the union earlier, which is not what he told the union. There were also five others that were not noticed to the union. And the union decides, you know what, I'm not going to grieve this. And he gets terminated. After that decision, not to grieve and... At that point, he comes back to the union and the union says, okay, let me ask them one more time. If they'll just give you their job back, even though we're not filing a grievance on your behalf. And when he goes back for that, at that point, we get the voluntary quit agreement. Is that the sequence? The sequence is not exactly right. Okay, so help me out then. All right. Can I just interject this? Did he sign, in effect, the settlement agreement at the time of this voluntary quit? He did, but he did not know that he was signing it. No, I get your point. But, I mean, there was a document signed that purported to terminate the dispute. Yes. Right. To terminate the employee, but the employee would receive this voluntary quit, but he was to release the employer as well as the union of all liability under federal and state law. So the correct sequence of events are that he was terminated on March 31st, the very same day he filed his grievance. It went through some sort of investigation. Well, okay, he's terminated, and then he files the grievance on that after he's been terminated. Right. Files it with the union. Right. The company then turns over what it has on file. It has these written warnings that we claim were staled by time. There was a recognized industry-wide standard that after a year, these written warnings became stale. There were five, at least, 2001 through about 2008, that we believe were staled and should not have been considered. And then there were PPNs that were submitted, which are called personnel and payroll notifications, which are technically unauthorized under the CBA. But the employer uses it to build a jacket to support termination later on, yet these particular PPNs are not sent to the union and are not sent to the employee. So what were the things? There were three things that were sent to the union. What were those? There were, actually, I think there were five written note warnings that were sent. To the union? No, not only one was sent to the union. I have something in my name that I read here that says that three were sent to the union. Three sent to the union that they discovered afterwards. Well, the union did an investigation. We have the declaration of the guy who actually, on the union side, looked through all their files. And after his review, he could only find one in 2009. But none of the ones that have preceded that were in the union's possession. And this guy said he did a very good job searching through the union files. So how come I'm under the impression that three things were sent to the union? You may have been reading the wrong brief, Your Honor. I guess they can tell me what their evidence is for saying that there were three. I don't know what they would imply. I see ER 2517, 2518, and 2520 said that it's undisputed that there were three grievance warnings that were found in union files. Do you know something to the contrary? Yes. I took a deposition of Mr. Sessions, and he said they could only locate one. And what page is that on? Oh, boy. This extensive record. All right. At page 62 of my brief, opening brief, it says, Sessions admitted his declaration. Thus, in searching local 324's files, I was only able to locate two prior written warning notices issued to plaintiff, one for purportedly not cleaning up his workstation, and one dated June 26, 2009, for a customer complaint. So now it's two, not one. Well, technically, it's a customer complaint we're looking at, because that was the reason he was being terminated. And where in the record? Well, where do you want to find it? It's in tab 16, volume 10, page 2531. And it's also mentioned in another place. And where is that? Volume 4, 625 through 627. Okay. All right. So let's say there are two. What difference does it make? What difference? They had at least these. The Stader brothers said they had eight more. They go, I get from the record that there's a pretty collegial relationship between the union and these folks. Usually they're able to handle things without a whole lot of trouble. They are presented with the fact that they've got at least, you say two, they say three, of these things in the file. And the union says, God, there's so many of these things. We don't think we can defend this thing. Well, the best thing we can do for you is get a voluntary quit so it's not on your record. And you're saying that under those circumstances that the union has breached its duty to your client? Well, I think we're looking at it in the wrong way. We are or you are? You are. Okay. And the reason for that is if we were to look at the primary thrust of this, looking forward, if there is a fiduciary relationship between a union and a union member who does pay dues every month, there's no question there's a special bond there. Is there a legal fiduciary duty under a CBA? For a CPA? I'm sorry, no, not CPA. They wouldn't have any fiduciary duties, of course, but a collective bargaining agreement. You're just saying the relationship of the union and its members. You said that's a fiduciary duty. That is a pronouncement from the U.S. Supreme Court. Okay, in what case? In the airline pilots versus O'Neill case. And that says it's a fiduciary duty? I actually put it in there in the brief. It says that the duty is akin to the duty fiduciaries give to their beneficiaries. I'm paraphrasing. Oh, it's akin. Is that what the Supreme Court says, it's akin? They say akin. Okay. Which I don't think denudes it any much. I think it's very clear that that's what they're recognizing, that there's a fiduciary role. Okay. So if we play it through an attorney, and we assume the fiduciary is the attorney and his client is the, you know, the innocent bystander, the attorney settles the case for wrongful termination and presents the settlement agreement from the employer to sign. Says nothing. Says if you want money, sign this. And unbeknownst to the client, in there contains language that's exculpating the attorney from any liability. It says he is to be held harmless from any wrongful act. Matter of fact, your attorney did a great job. And without telling him about it, he has to sign off. Isn't there a duty? Was he represented by counsel at any point? Huh? Was he represented by counsel at any point? No. No, of course not. But the point is, is there is a fiduciary relationship between the union. And there was at no point any interest by the union to say go out and seek independent advice because we have exculpatory language contained in this release agreement that excuses us from all liability and gives us a pat on the back saying that we did a good job representing you. Counsel, I mean, I completely agree with your argument there. That would negate the settlement, the release as to the union. But then, okay, on the merits, I guess I didn't hear a response to Judge Smith's question. What exactly did they do to meet a pretty demanding standard for proof? True, but we never really get to that point because if you look at the motion for summary judgment, the court really relied solely upon the settlement agreement and did not dig in to the specific facts of this case. And that is where we feel some injustice was realized. If, in fact, the court had said, yes, I understand that, and you know what, I'll just put that settlement agreement aside, we'll take a look at the facts. But that was not the case. And if you read the judge's decision, he really relied solely upon that settlement agreement. And that's where we feel we have a triable issue because we have two issues at stake here. We can show the scaling of the written notices that were prior to 2009, and we can show that the PPNs weren't authorized by the court. You know, I don't read the district court the way you do. As I read the district court, it looked at the fair representation claims independent of any waiver contained in or settlement agreement contained in the voluntary quit. The only thing that the voluntary quit did was to absolve, as the district court decided it, was to absolve the company. As I read it, the district court addressed on the merits the fair representation claim and did not rely in any respect on a hold harmless or settlement part of the clause in the voluntary quit agreement. Am I wrong? No, you're right. Okay. But one thing, too. So let's just address directly on the merits, as the district court did, the fair representation claim. But as the DFR claimed, the court did not give the plaintiff time to discover it. If you'll remember, this is a complaint that was filed early on, and the union filed a motion for summary judgment before there was any discovery conducted. But at least as I understand it, what you were looking for in your 50-60 motion was irrelevant to the question that was before the court on the duty of fair representation. Oh, surely it was relevant. If, in fact, there was a settlement agreement, we are entitled to explore that. Because that put it rendered useless. But as I understand it, this is really a pretty straightforward breach of claim, breach of contract claim against the union for breaching the CBA, right? Isn't that really the basis of your claim? Correct. So anything that you would be trying to discover would have to, if it's relevant, would have to be based upon a breach by the union of its obligations under the CBA. Correct. And that would include the good cause provision. They could not remove him except for good cause. That was one of the underlying contractual requirements. Were you aware of that? Oh, yeah. Absolutely. Okay. Another thing, too, is that we had a wrongful termination claim, similar to the common issue that you previously discussed. This was dealing with safety violations and potential sexual harassment issues. And that was a separate cause of action. And we believe that it furthered state policies. There's no question that if meat is being thrown around on the floor and put in a bone barrel, that that could be a contamination issue that would affect the public interest, and clearly something outside the garment preemption issue. I'm a little worried that you're not going to be saving any time for rebuttal. You're right. Thank you. How much time do I have left? One minute and 20 seconds. I wish I could see it. It should be on the other side. You should be able to see it. Okay. Let's hear from the union. May it please the Court, good morning. Good morning. My name is Robert Cantori, and I'm the attorney for the union. I will be brief. When I got this case from my client, I took one look at it, took one look at Stevens v. Moore, which I have cited in more than one case, and said, this doesn't even have to wait for discovery. The facts are, yes, Sessions found one in the one morning notice in the union's file. He stopped looking at that point in time. He then asked the company, what do you got in your file? The company sends him all the notices, and then he confirms that three, that's where you got the number, three actually were sent to the union, five were not. Only one need be said. The guy had a 10-year record of abusing customers. The union said, we can't take this to arbitration. They informed the division after doing a reasonable investigation and came to the decision we're not processing the grievance. That is Stevens v. Moore. He lost it 20 years ago. Let me interrupt you right now. I'd like to read you three passages from your briefing. I'm on page two. Understatement of the issues. With all due respect to his overly verbose and convoluted statement of the issues, I'm on page three. Much like the hybrid case, Stevens, a case which Ehrlichman's attorney lost in this court nearly 20 years ago. I'm on page seven. At this point, and only because Ehrlichman does not appear to grasp it, I find those statements gratuitously insulting and offensive. They do not belong in a brief. They are ad hominem. Stick to your case. I speak only for myself. My colleagues may feel differently, but I feel that way. I apologize, Your Honor, except that I have been representing labor unions now for 38 years, and contrary to popular belief, they are not rich. I take discounted attorney's fees because they are not rich. And having to defend and waste dues-paying money on these fights, Your Honor, I find offensive. I find offensive. I apologize. You can find whatever you like offensive, but I want you to register that at least as to this judge, these ad hominem attacks serve only to undermine your credibility and your case. And, Your Honor, I think that my comments, while possibly distasteful, also support double costs of attorney's fees on this appeal. This is not a case that is in any way, in any way different than the actual cases that have been coming down since Stevens, standing for the proposition that where a union makes a reasonable, exact words are minimal, investigation into the merits of agreements and makes a reasonable determination based on that investigation, even if it is wrong, even if it makes a mistake in doing so, there's no breach of the duty of fair representation. And for that reason, my comment, Your Honor, is this. I feel sorry for pro per plaintiffs. I deal with these cases all the time. This is not my first EFR case, and it's not the first time I've had argued Stevens v. Moore. I just find it discomforting that I have to argue Stevens v. Moore to the attorney who argued the case 20 years ago. And that my client has to spend, these are retail clerks, Your Honor, they don't make a lot of money. And paying any kind of dues is a burden on their wallets. And taking that money to pay me to defend this lawsuit I think is a crime. I do. With respect to the release, it is in plain English, the head of the union is a meat cutter. That's his experience. That's his training. He's a meat cutter. Yet he's supposed to be able to advise another meat cutter, and I forget the language that Mr. Plaintiff used, onto the nice legalities. He assumes that I drafted the release. I've never seen it before this case started, Your Honor. Never saw that release before. And I don't think counsel for employers saw that release before. This is something the parties got up, the layman got up together, put together, and his client signed it. Let me be sure I understand that. You're saying that the settlement agreement, which I understand was signed after the union said it's not going to go forward with an arbitration. Absolutely correct. And you met with the union member and said, look, maybe we can get you a voluntary quit. That's when they got together and the settlement agreement was drafted, and you're saying it was drafted by laypeople. Yes, Your Honor. Okay. The scenario was the member, there was a second step meeting, they gather all the facts, the union decides that it's not going to take the case to arbitration, calls the member in, says we're not taking the case to arbitration, hears why, shows them all the warning notices, some of which were sent to the union, some of which were not, and says we're not taking the case to arbitration. The member says, oh, but I've been a member for 10 years, please do something for me, and possibly stupidly, the field director says, okay, I'll see if I can get one more meeting up with the employer so you can plead for your job. They set up the meeting with the employer, he goes in and pleads for his job. In fact, according to everything in the record, he read from a prepared script, he made his plea, the head of labor relations for the employer says, well, not the head, some director of labor relations for the employer says, I don't believe you can change, I think you're incapable of changing, we're not going to give you your job back, but you can have a voluntary quit. The next day, the employer sends over a draft of this voluntary quit, it contains all the language the counsel is now complaining about, the union signs it, calls the member in, the member signs it, the testimony in the deposition was he didn't read it, the union business agent who gave it to him didn't say anything about it, he just handed it and said, this is what you have to sign, he signed it, and it's over. Again. So I thought you said that some lay people drafted it. Did I understand you to say that somebody from Slater Brothers, Slater Brothers drafted this and then sent it to the union, is that correct? Somebody from Slater Brothers sent it to the union. Okay, so you don't know whether an attorney or somebody else prepared it. I know that the HR people in Slater Brothers are not your lawyers, but whether they sent it to a lawyer, I have no idea. But it came from the employer. It came from the employer, but it's also something. In other words, what you initially said is not right. I'm sorry? In other words, what you said may or may not be right. You said this was done by lay people, and now you say you don't know. I am saying, Your Honor, that I know my client, it's been my client for over 20 years, and I know my client and know that its customary practices are to avoid calling lawyers. No, no, no, wait a minute. This is a different question, and I think it's irrelevant to what's going on here, or largely irrelevant, but here you are complaining about the lawyering on the other side, and you stand up and tell us that this agreement was drafted by lay people. That's what you said. Yes, Your Honor. And now you say the agreement came from Stater Brothers, and you don't know who drafted it. You don't know whether they called their lawyer. No, Your Honor. So which one's true? Almost all of the above. What I do know. What's not true? What I do know is that these types of agreements typically get sent back and forth over the years and get modified over the years. Who drafted what language? Who put in what language? It rarely gets sent to a lawyer. But you don't know. I don't know. I don't know. You said at one point it was drafted by lay people. The truth is you don't know. The truth is I don't know. All I can do is make a reasonable, educated guess. That would have helped if you had said it that way the first time. I apologize again. But the bottom line is, Your Honor, this is Stevens. The bottom line is this is Stevens, that the union did not breach its duty of fair representation, and, therefore, at least the breach of contract claim against the employer has to fail. The issue on the release, we didn't rely on it in the court below. We relied solely on the established precedent that this court has set and did not rely on it. That said, I don't think the union is a fiduciary. I don't think it is anything more than a group of employees that have no special expertise that are not expected to have any special expertise and should not be held to a standard of having special expertise. Let me ask you about that. Your opposing counsel suggests that the union, in its relationship with its members, occupies something akin, whatever that means, to a fiduciary duty. Would you like to comment on that? Yes, Your Honor. They don't. They occupy a position of trust. Sort of like a fiduciary duty? Not quite to the level of a fiduciary. That is, they cannot lie to their members. They cannot hold up an agreement and say, this is what you're ratifying and really have signed something else with the employer. They own that kind of position of trust. When it comes to money, the money of the union, there they are the very most positions of trust. For misspending a dime, they can go to jail. For getting there, they are fiduciaries. Not in their dealings with their members. There they only have a duty to be nondiscriminatory and not lie to them, be dishonest. Bottom line, from your perspective, I gather that, however, the happy relationship between you and opposing counsel, the reality is that under the law, the union did all it was required to do here. There was no breach of the duty. End of story. That's your statement. End of story, Your Honor. Okay. I'll let you hear from the employer now. Yes. Thank you.  Good morning, Your Honors. May it please the Court. My name is Brendan Brandt, and I represent Defendant Apelli, State of Brothers Markets. The issue that was squarely before the district court on summary judgment on behalf of State of Brothers Markets was, was this release agreement a valid and binding agreement in which the parties entered into? I believe that the district judge on summary judgment found this correctly to be a clear, concise, one-page agreement in which the plaintiff, now appellant, had the opportunity to review, knew what was in it, and entered into the agreement, as the court said, with his eyes wide open, and now seeks from this appellate court, in his own words, to renege on that very agreement in which he signed, in which, on the record, he admits that he received a benefit, as this court correctly. The benefit here was a voluntary quit as opposed to being fired. Is that right? Yes. And you raised a very good point on that issue, and that is, at the point that he had signed the voluntary quit, he had already been told by State of Brothers that he was terminated from his employment, and he had already been told by the union that they had investigated the reasons for his termination, namely all the written reprimands and the verbal reprimands that were confirmed in writing by the PPN. I believe there was five different PPNs. And what's also important is these were all for the same violation. These were all for customer service. Let me make sure I understand from the perspective of the consideration that passed here. Does the record reflect the consequences to Mr. Ehrlichman if he had not had a voluntary quit? In other words, it's a union occupation primarily in the L.A. area. Does the record indicate whether, if there were not a voluntary quit, he could have possibly gotten other employment in the L.A. area in a similar situation? Well, I think part of that would be a basis of speculation, but there is direct evidence of a benefit that he received from the voluntary quit. And I raise that in my reply brief and in his deposition, and that is after being terminated from Stater Brothers, he went and received a job from Henry's Market. And with Henry's Market, he put on that very job application that he voluntarily quit from Stater Brothers. What was the name of that other market, Henry's? Henry's Market. And in the record, in his deposition, he is then terminated from Henry's Market ten days later for job performance issues. So he did get a benefit from the voluntary quit when he went out into the workplace and got a job at Henry's Market, and he represented to the world and to Henry's that he had a voluntary quit from Stater Brothers. And if you want, I can cite it. You think, is there anything in the record that suggests that that voluntary quit showed any particular knowledge on behalf of Mr. Ehrlichman of what was in the agreement, what benefit he might receive? Absolutely, Your Honor. I think the record is very clear from his own deposition testimony that he said, and I get as close to quoting as I can, I knew I was getting something of a benefit by signing the voluntary quit because I could tell people that I was not fired, that I voluntarily quit. And I asked him that specifically, and was that of value to him? And he replied, yes, in his sworn testimony. Your time is up. Thank you, Your Honor. Thank you very much. Now let's hear from the appellate. There's a little bit of time left. Can you see the clock over there on that side, what you've got left? No, not there, the other side. Over here? No, no, it isn't there. It's on my side. Oh, there it is. Thank you. All right. Thank you. Right there in front of me. The one that goes down. Okay. There had been a history of using this voluntary quit over a number of years. As a matter of fact, we took the deposition, I believe, of the human resources guy, for Stater Brothers, his name was Dwayne Snyder. He said that he'd been with the company for 11 years, and that at least during the 10-year period they had been using the voluntary quit. It was a standardized form, not only with this union, but other particular unions involved. Interesting thing that came out from Mr. Snyder's testimony and deposition is that out of 50 to 100 grievances that were filed by this local union, 324, all of them, and I stress that, all of them were pushed into voluntary quits except for one. During a 10-year period, this union took only one grievance to arbitration against Stater Brothers, one out of 50 to 100. They were using this voluntary quit in a form of pattern and practice of pushing them out. We don't know that, do we? That's not in the record. Yes, it is in the record. It's on page... Deposition, but I'm talking about any findings of fact by anybody. This is yours. Yes, this is what came. We put it into the record. I mean, it was before the court in our statement of genuine disputes. And so, I mean, obviously this shows something that maybe it was a systematic approach by the union to say, look it, we can push these grievances into a voluntary quit. We get full releases. They give us the pat on the back saying we did an exemplary job as the union representative, and we've saved the union tons of money. And that was one of the focal points of why I brought this up. Okay. Well, unfortunately, your time is up. It is. Thank you very much. We thank you all for your argument. This case is just argued as submitted. And that concludes our argument calendar, not only for today but for the week. And the Court stands adjourned. Thank you all for attending.
judges: Fletcher, Smith, Watford